**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD BYRD,                    ) | No. CV-F-06-900 OWW/GSA |
|                                  ) | |
|                                  ) | MEMORANDUM DECISION GRANTING |
|                                  ) | DEFENDANT MARK PAZIN'S |
|            Plaintiff,            ) | MOTION FOR SUMMARY JUDGMENT |
|                                  ) | (Doc. 60) |
|       vs.                        ) | |
|                                  ) | |
|                                  ) | |
| ATWATER RESERVE OFFICER          ) | |
| TEATER, et al.,                  ) | |
|                                  ) | |
|            Defendants.           ) | |
|                                  ) | |
| _____) | |

Before the Court is Defendant Mark Pazin's motion for
summary judgment.

Defendant Pazin's motion for summary judgment was filed on
December 26, 2007 and noticed for hearing on January 28, 2008.
On January 7, 2008, Plaintiff, represented by attorney Kevin
Little, filed a request for continuance of the summary judgment
motion, asserting that Pazin's motion was premature and that
"[o]nly after plaintiff has had an opportunity to conduct
discovery on all of the many issues raised in Pazin's motion

1

1   should it be considered." At the hearing on January 28, 2008,

2   Plaintiff requested 45 days to conduct depositions. By Order

3   filed on February 29, 2008, Plaintiff was ordered to complete the

4   deposition of Defendant Pazin on or before March 10, 2008, "in

5   the event counsel for Plaintiff chooses to [do so]." Plaintiff's

6   opposition was ordered to be filed on or before April 10, 2008.

7   Plaintiff did not depose Defendant Pazin. At the hearing on

8   Pazin's summary judgment motion, Mr. Little stated that he did

9   not depose Defendant Pazin for the reason that Defendant Pazin

10  would not tell the truth. Plaintiff did not file his opposition

11  to the summary judgment motion until April 11, 2008, one day

12  late. Plaintiff filed an omitted exhibit to his opposition on

13  April 17, 2008

14      Also on January 28, 2008, the Court heard Defendants' motion

15  to dismiss the Complaint. Those motions were noticed for hearing

16  on November 19, 2007. However, on November 19, 2008, at the

17  hearing, Mr. Little requested a continuance of the hearing date

18  of the motions to dismiss in order to submit opposing briefs.

19  The hearing on the  motions to dismiss were continued to January

20  28, 2008. The motions to dismiss were resolved by Memorandum

21  Decision and Order filed on February 21, 2008 and Plaintiff was

22  ordered to file a First Amended Complaint within 20 days.

23  Thereafter, Plaintiff filed a motion for reconsideration of a

24  single issue. The motion for reconsideration was granted by

25  Order filed on April 8, 2008. Plaintiff has yet to file a First

26  Amended Complaint.

Mr. Little's repeated failures to timely prosecute this cases and comply with Court Orders have inconvenienced the parties.   The Court heard a summary judgment motion directed to a Complaint that has been dismissed; Plaintiff has yet to file a First Amended Complaint, leaving the Court and Defendant Pazin to guess exactly what claims remain in this action against the defendants.

**A.   <u>GOVERNING STANDARDS</u>.**

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.   A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.   *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).   Materiality is determined by the substantive law governing a claim or a defense.   *Id*.   The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.   *Id*.

The initial burden in a motion for summary judgment is on the moving party.   The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   The burden then shifts to the nonmoving party to defeat summary judgment.   *T.W. Elec.*, 809 F.2d at 630.   The nonmoving

3

party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id*. The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*. As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102-1103 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant. Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant. Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

> A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential

> element to carry its ultimate burden of
> persuasion at trial ... In order to carry its
> ultimate burden of persuasion on the motion,
> the moving party must persuade the court that
> there is no genuine issue of material fact
> ....
>
> If a moving party fails to carry its initial
> burden of production, the nonmoving party has
> no obligation to produce anything, even if
> the nonmoving party would have the ultimate
> burden of persuasion at trial ... In such a
> case, the nonmoving party may defeat the
> motion for summary judgment without producing
> anything ... If, however, a moving party
> carries its burden of production, the
> nonmoving party must produce evidence to
> support its claim or defense ... If the
> nonmoving party fails to produce enough
> evidence to create a genuine issue of
> material fact, the moving party wins the
> motion for summary judgment ... But if the
> nonmoving party produces enough evidence to
> create a genuine issue of material fact, the
> nonmoving party defeats the motion.

In *Carmen v. San Francisco Unified School District*, *supra*, 237 F.3d at 1031, the Ninth Circuit held:

> [T]he district court may determine whether
> there is a genuine issue of material fact, on
> summary judgment, based on the papers
> submitted on the motion and such other papers
> as may be on file and specifically referred
> to and facts therein set forth in the motion
> papers.  Though the court has discretion in
> appropriate circumstances to consider other
> materials, it need not do so.  The district
> court need not examine the entire file for
> evidence establishing a genuine issue of
> material fact, where the evidence is not set
> forth in the opposing papers with adequate
> references to that it could conveniently be
> found.

The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the

5

evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.*

B.   <u>DEFENDANT PAZIN'S STATEMENT OF UNDISPUTED FACTS</u>.

<u>PUDF 1</u>:  On March 11, 2004, Plaintiff Richard Byrd was arrested and booked into the Merced County Jail on charges of attempted bribery of a peace officer. [Compl. ¶¶ 20, 21].

Plaintiff asserts that "[t]his is an incomplete statement of the pertinent facts, since the alleged bribery scheme was intended to obtain address information for a Merced County Sheriff's Deputy, and according to his media statement, the date after Byrd's arrest, defendant Pazin was intimately familiar with the details of the underlying investigation."[1]

---

[1]Plaintiff has not complied with the requirements of Rule 56-260(b), Local Rules of Practice.  Rule 56-260(b) provides:

> Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial.

1  This fact is undisputed.  Plaintiff's assertions are
2  immaterial to the fact stated.

3     PUDF 2:  On March 15, 2004, Byrd was charged with bribing
4  City of Atwater Reserve Police officer Michael Teater, in
5  violation of California Penal Code Section 67.

6     This fact is undisputed.

7     PUDF 3:  Byrd also was charged with carrying a loaded
8  firearm, contrary to the terms of release regarding his
9  arrest of November 21, 2003

10    This fact is undisputed.

11    PUDF 4:  At the time of Byrd's arrest, Mark Pazin was the
12 duly-elected Sheriff for the County of Merced.

13    This fact is undisputed.

14    PUDF 5:  Following the arrest of Mr. Byrd, Sheriff Pazin had
15 very limited knowledge or information regarding Byrd's criminal
16 court process, including but not limited to Byrd's arraignment,
17 bail or other criminal case-related matters.  [Pazin Decl., ¶ 4.]

18    Plaintiff asserts that this fact is disputed "by defendant
19 Pazin's media statement the day after Byrd's arrest, which showed
20 that he was intimately familiar with the details of the
21 underlying investigation, as well as Byrd's background and his
22 custody and bail status" [and that] Pazin's declaration to the

23
24
_____
25 Although Plaintiff has submitted evidence in opposition to the
   motion for summary judgment, Plaintiff does not provide citations
26 to that evidence in disputing Defendant's facts.

7

contrary seems to be intentionally false and misleading."[2]

Paragraph 4 of Pazin's declaration avers:

> 4. Following the arrest of Mr. Byrd, I had very limited knowledge or information regarding his criminal court process, including but not limited to his arraignment, bail or other criminal case-related matters. Specifically, I was not and am not aware of the exact amount at which Mr. Byrd's bail was set; all bail amounts are set by the Presiding Judge. I had absolutely no role whatsoever in setting the amount of bail or in otherwise recommending that bail set at a specific amount. This is a function of the District Attorney and the judge assigned to the case; it does not and did not involve myself, the Sheriff. I did not communicate with Defendant Gordon Spencer or any other deputy district attorneys and/or C. Logan McKechnie, Mr. Byrd's criminal defense counsel, in Merced County regarding any aspect of the criminal case against Mr. Byrd or any issues related thereto.

Plaintiff's reference to Defendant Pazin's "media statement" appears to be a reference to a newspaper article in the Merced Sun-Star on some unspecified date. The newspaper article reports Byrd's arrest and further states:

> ...

> The suspect remains in custody in lieu of

---

[2]At the hearing, Mr. Little contended that he did not take Defendant Pazin's deposition because he had no confidence that Pazin would be any more forthcoming in his deposition than he was in his declaration. Mr. Little contended that Pazin's declaration evidences "careful and deceptive drafting" and, therefore, summary judgment should be denied. Defendant Pazin points out that his declaration in support of the summary judgment motion was filed on December 27, 2007. Mr. Little requested a continuance of the summary judgment motion in order to depose Defendant Pazin and could have questioned Defendant Pazin about the drafting of his declaration and all the other factual circumstances raised by this motion.

1
          **$500,000 bail, according to Merced County**
2
          **Sheriff Mark Pazin.**

          **...**
3
4
          **Pazin said the case goes back to November**
          **2003 when a sheriff's deputy arrested Byrd at**
5
          **Franklin Road and Ladino Avenue for**
          **reportedly having a firearm in a vehicle and**
6
          **for driving under the influence.**

7
          **...**
8
          **Pazin said the department takes a very dim**
          **view of persons who threaten or intimidate**
9
          **employees of the department especially when**
          **it involves testifying in court.**

10
   **This newspaper article, which is hearsay, is not**
11
**inconsistent with the averments in Byrd's declaration or PUDF 5.**
12
   **PUDF 6:  Pazin was never aware of the exact amount at which**
13
**Mr. Byrd's bail was set; all bail amounts are set by**
14
**the Presiding Judge. Pazin had absolutely no role whatsoever in**
15
**setting the amount of bail or in otherwise recommending that bail**
16
**be set at a specific amount. [Pazin Decl., ¶ 4].**
17
    **Plaintiff disputes this fact, again asserting that Defendant**
18
**Pazin's "media statement" shows that Pazin was familiar with the**
19
**details of the investigation and the amount of Plaintiff's bail.**
20
**Plaintiff asserts that "Byrd's presumptive bail in connection**
21
**with his booking for some reason greatly exceeded the amount**
22
**of bail corresponding to his arrest offenses as per the operative**
23
**Merced County bail schedule", that "[t]he presumptive bail**
24
**amounts are set by the presiding judge and memorialized in the**
25
**bail schedule, but there is no explanation for why Byrd's pre-**
26
**arraignment bail was set so much higher; however, Byrd was in the**

1  custody of the Merced Sheriff when this arbitrary and excessive

2  bail was fixed."

3      This speculation is immaterial.  Pazin's only reference to

4  the amount of bail is to a matter of public record and is

5  indicative of nothing else regarding the intricacies of

6  Plaintiff's bail.  Whatever Plaintiff's initial bail on booking

7  was, there is no evidence that Defendant Pazin had anything to do

8  with setting the amount of that bail.  Plaintiff did not depose

9  Pazin and offers no evidence whatsoever that Defendant Pazin had

10  any involvement in the bail set by the Superior Court.

11      This fact is undisputed.

12      <u>PUDF 7</u>:  Setting bail is a function of the District Attorney

13  and the judge assigned to the case and does not involve the

14  Sheriff. [Pazin Decl., ¶ 4.]

15      Plaintiff asserts that "Byrd's presumptive bail in

16  connection with his booking for some reason greatly exceeded the

17  amount of bail corresponding to his arrest offenses as per the

18  operative Merced County bail schedule", that "[t]he presumptive

19  bail amounts are set by the presiding judge and memorialized in

20  the bail schedule, but there is no explanation for why Byrd's

21  pre-arraignment bail was set so much higher; however, Byrd was in

22  the custody of the Merced Sheriff when this arbitrary and

23  excessive bail was fixed."

24      Accepting all that Plaintiff says, his initial bail on

25  booking was set by a judge.  Plaintiff presents no evidence from

26  which it may be inferred that Defendant Pazin had anything to do

10

with setting bail at the time of Plaintiff's arrest or that
Defendant Pazin had any involvement in or advance knowledge of
the bail set for Byrd by the Superior Court.

This fact is undisputed.

**PUDF 8**:  Sheriff Pazin did not communicate with Defendant
then-District Attorney Gordon Spencer or any other deputy
district attorneys and/or C. Logan McKechnie, Mr. Byrd's criminal
defense counsel in Merced County regarding any aspect of the
criminal case against Mr. Byrd or any issues related thereto.
[Pazin Decl., ¶ 4].

Plaintiff disputes this fact because of Defendant Pazin's
media statement the day after Byrd's arrest, which showed that he
was intimately familiar with the details of the underlying
investigation, as well as Byrd's background and his custody and
bail status.  Plaintiff further asserts that "the Merced County
Superior Court's investigation also concluded that former DA
Spencer, defendant Pazin's alleged co-conspirator, and co-
purchaser of the subject property, was intimately involved in
Byrd's case during this same stage."

Plaintiff's assertions do not create an issue of material
fact; he presents no evidence whatsoever that Defendant Pazin
communicated with Defendant Spencer, any other deputy D.A., or
Plaintiff's defense counsel regarding any aspect of Plaintiff's
criminal case.  Further, an alleged Merced County Superior Court
investigation is not identified.  Plaintiff has not included this
report in his exhibits.  Plaintiff's inference that, because

11

1  Defendant Spencer, who was the *District Attorney*, was "involved

2  in" Plaintiff's criminal case, and because Plaintiff has named

3  Defendant Spencer as a co-conspirator, Defendant Pazin must have

4  had communications with these individuals, is unsupported by any

5  evidence after four years to investigate.

6       This fact is undisputed.

7       PUDF 9:  Mr. Byrd's own counsel in the criminal case, C.

8  Logan McKechnie, confirms that Sheriff Pazin played no role in

9  Mr. Byrd's arrest and detention.  Specifically, Mr. McKechnie had

10 no information or knowledge that Sheriff Pazin in any manner

11 participated in Byrd's bail status or lack thereof. [Deposition

12 of C. Logan McKechnie ("McKechnie Depo."), at 69:15-18 (attached

13 as Exh. A to Declaration of Terence J. Cassidy in Support of

14 Defendant's Motion for Summary Judgment/Adjudication).[3]

15      Plaintiff disputes this fact because of Defendant Pazin's

16 media statement the day after Byrd's arrest, which showed that he

17 was intimately familiar with the details of the underlying

18 investigation, as well as Byrd's background and his custody and

19 bail status.  Plaintiff further asserts that "the Merced County

20 Superior Court's investigation also concluded that former DA

21 Spencer, defendant Pazin's alleged co-conspirator, and co-

22 purchaser of the subject property, was intimately involved in

23 Byrd's case during this same stage."  With regard to Mr.

24 _____

25      [3]At the time Pazin's motion for summary judgment was filed,
   Mr. McKechnie was a defendant in this action.  Mr. McKechnie's
26 motion to dismiss was granted pursuant to 28 U.S.C. § 1367(c)(4) by
   the February 21, 2008 Memorandum Decision and Order

McKechnie's deposition testimony, Plaintiff contends:

> he obviously does not have sufficient
> personal knowledge of facts that occurred
> outside of his presence to unqualifiedly rule
> them out. Nor does Mckechnie's performance in
> this case inspire any confidence in his
> contemporaneous knowledge of the attendant
> facts, since the transcript of Byrd's May 6,
> 2004 plea shows that McKechnie did not even
> then know what charges were then pending
> against his client (although he nonetheless
> offered to have Byrd plead to any and all of
> them).

Plaintiff's assertions do not create a genuine issue of material fact.  Plaintiff's assertions do not contradict Mr. McKechnie's deposition testimony.  Plaintiff has no evidence that Defendant Pazin played any role in Plaintiff's arrest and detention.  The Merced County Superior Court report, as described by Plaintiff, does not refer to Defendant Pazin. Plaintiff presents no evidence to refute PUDF 9.

This fact is undisputed.

PUDF 10:  Mr. McKechnie had no information or knowledge that Sheriff Pazin played any role in the filing of the criminal complaint against Byrd. [McKechnie Depo. 69:19-23].

Plaintiff disputes PUDF 10 on the same grounds as PUDF 9.

Plaintiff's assertions do not create a genuine issue of material fact.  Plaintiff's assertions do not dispute Mr. McKechnie's deposition testimony.  Plaintiff has no evidence that Defendant Pazin played any role in Plaintiff's arrest and detention.  The Merced County Superior Court report, as described by Plaintiff, does not refer to Defendant Pazin. Plaintiff

13

1   presents no evidence to refute PUDF 10.

2       This fact is undisputed.

3       <u>PUDF 11</u>:   There was no evidence that Sheriff Pazin played

4   any role directly or indirectly with the plea or sentencing of

5   Byrd. [McKechnie Depo. 70:1-5].

6       Plaintiff disputes PUDF 11, asserting as follows:

7               This fact is highly disputed by ample
                circumstantial evidence suggesting to
8               the contrary. Specifically, (1) Pazin had
                been aware of Byrd even before his arrest,
9               since he had personally come to Byrd's
                investigations office in Merced approximately
10              a year before the March 2004 arrest and had
                asked Byrd to remove a "Burke for Sheriff"
11              placard from the office window; (2) The
                Merced Sheriff's Office was the agency which
12              investigated Byrd for the criminal offenses
                for which he was arrested, as indicated by
13              the search warrant affidavit submitted by
                that agency in March 2004; (3) said search
14              warrant affidavit also cites the very same
                property address that was the subject of the
15              property transaction a few months later, 434
                W. Bellevue Road, Merced, California, and
16              said property was searched by Merced
                Sheriff's personnel in connection with Byrd's
17              March 11, 2004 arrest; (4) When Byrd was
                arrested on March 11, 2004, before he
18              appeared before any judicial officer, his
                bail was set at $500,000 by the Merced
19              Sheriff; (5) according to the operative bail
                schedule, and the offenses for which Byrd was
20              arrested, his bail should have been set at no
                more than $65,000 ($50,000 of which was based
21              on the false and ultimately dismissed charge
                that Byrd, who had a valid concealed weapons
22              permit as a private investigator, had
                violated Penal Code § 12031); (6) Byrd's bail
23              was never reduced, even after he pled no
                contest to a charge under Penal Code § 69,
24              which carried a presumptive bail of $15,000;
                (7) Byrd's bail was set so high, even though
25              he had no violent criminal history, and the
                reserve officer upon whose sole word the
26              charges were based, Atwater Reserve Officer

                            14

Michael Teater, had an extensive criminal
history, including offenses of dishonesty,
and also had an outstanding debt to Byrd that
ultimately resulted in a small claims
judgment against him; (8) during the same
time period where Byrd's bail was set at
$500,000, criminal defendants facing more
serious charges (as per the operative bail
schedule) of drug trafficking, robbery,
burglary and other offenses had bails set in
the range of $16,000 to $65,000; (9)
defendants facing life imprisonment under the
operative bail schedule were entitled to the
same bail set for Byrd; (10) criminal
defendants charged with both attempted murder
and gang enhancements had their bail set the
same as Byrd's; (11) Byrd's name appeared
prominently on property transaction related
documents prior to the closing, in some
instances on the signature line directly
opposite Pazin's, and listing the same
property address as the search warrant
property; (12) Byrd did not sign many of the
property transaction documents himself, but
instead had them signed by his daughter,
Linda Roybal, his appointed attorney in fact,
including on documents where defendant Mauzy,
one of the purchasers, was paid $78,000
commission for selling the subject property
to himself and his co-conspirators; (13)
another property on Bellevue Road, father
[sic] away from then proposed development and
three acres smaller than Byrd's 24 acre
parcel, was listed in 2003 for $6.6 million;
(14) although he now professes relative
ignorance of Byrd's arrest, prosecution,
bail, and custody status, defendant Pazin
himself announced to the media that Byrd, the
owner of Central Valley Private Security, was
arrested, that the arrest related to an
alleged effort to obtain information about
the whereabouts of a Merced Sheriff's Deputy
(even though Byrd, as a prominent Merced
private investigator, had the computer and
other resources to easily obtain this
information on his own), and Pazin
specifically stated that Byrd "remain[ed] in
custody in lieu of $500,000 bail"; (15) in
his announcement to the press, Pazin also
outlined the background of the investigation
leading up to Byrd's arrest and also stated

15

that "We will not tolerate anyone who tries to intimidate or dissuade a witness from testifying in court"; (16) Byrd's arrest and prosecution were frequently and prominently in the media during the pendency of his criminal case, so it is unlikely that defendant Pazin was unaware of Byrd's status, as he now suggests despite his contemporaneous media statements; (17) Pazin was the executive officer ultimately in charge of Byrd when he was in custody at the Merced County jail, and therefore had the authority to permit the alcohol dependent Byrd to be released on house arrest or placed in an alternate setting, such as an alcohol treatment program, at any point during his pretrial incarceration; (18) Byrd was not improving in terms of his state of sobriety during his period of pretrial incarceration and instead continued to drink illicit alcohol beverages frequently during that time, so much so that he was taken on an emergency basis from the Merced County jail to receive medical treatment in April or May 2004; (19) Byrd's ownership of the subject property was clearly known to members of the alleged conspiracy during his pretrial incarceration, especially defendants Stephen Mauzy and Century 21 Salvadori Realty, Pazin's co-conspirators who served as Byrd's agents but who also were purchasers of the property; (20) neither Byrd nor any family member was ever provided with any appraisal for his property during the prepurchase time period; (21) the land transaction closed on July 1, 2004, two weeks before Byrd's release from custody on July 16, 2004, although it had been established since his May 6, 2004 plea that he would be placed in an alcohol treatment program upon sentencing and could have been placed in such a program earlier; (22) Byrd was not able to reason effectively or think clearly during his period of incarceration, as he was still abusing alcohol and/or was not receiving any sort of alcohol abuse treatment during that time period; (23) Byrd was forced to sell his property because his investigation firm had cash flow problems due to his in custody status and attorney's fee obligations, problems which would likely have not arisen

16

had he not continued to be in custody; (24) defendant Pazin admitted to the media that he was aware of Byrd's being the owner of the subject property prior to the consummation of the purchase, stating that he learned of Byrd's identity in the final stages of the deal and acknowledging after the deal was publicly exposed that this could give rise to a "perception issue"; (25) the presiding judge of the Merced Superior Court, Frank Dougherty, determined after an investigation that defendant Spencer, Pazin's co-conspirator and friend, was "intimately involved" in pressing the felony charges against Byrd and clearly knew that Byrd was the same person selling the subject property; (26) there were offers and counteroffers made between Roybal and the purchasers prior to the consummation of the deal in May through July 2004 (after Pazin admittedly became aware of and involved in the land deal), and Pazin's authorization ostensibly would have been required in connection with these negotiations; and (27) Byrd was sentenced to an excessive 180 days, and served even more, 192 days, before his sentencing and release to the in patient alcohol rehabilitation program, although Byrd could have received jail time credits had he been immediately released to said program after (or even before) his May 6, 2004 plea.

This litany of damning facts makes it clear that Byrd's federal and state claims must proceed to trial. Pazin's essential factual assertions are that he was minimally involved in the case against Byrd, and only belatedly learned that the subject property was owned by Byrd.  Reasonable disputes have been raised regarding these factual assertions based on the facts set forth above. One could only enter judgment in favor of Pazin by interpreting the record in the light most favorable to him, contrary to established summary judgment practice under Rule 56. Further, the Court should be highly concerned that Pazin has subscribed to a declaration that seemingly contains intentional falsehoods, specifically his statements indicating that he was not contemporaneously aware of Byrd's arrest (¶ 3), lacked

1    knowledge of Byrd's bail status and criminal
2    case (¶4), and did not know that Byrd did not
     post bail and remained in custody (¶5).
3    Pazin's own statements to the Merced Sun-Star
     the day after Byrd's March 11, 2004 arrest
4    contradict all of these belatedly asserted
     points.

5    Other than rhetoric, Plaintiff has no evidence to dispute

6    PUDF 11 that Defendant Pazin had no role in Plaintiff's guilty

7    plea or sentence.   Plaintiff did not depose Defendant Pazin and

8    has nothing to establish that Plaintiff's bail was set or

9    continued by or with the participation of Defendant Pazin or that

10   the delay in sentencing Plaintiff was caused in any way by

11   Defendant Pazin.[4]

12   This fact is undisputed.

13   <u>PUDF 12</u>:   There were no facts or information to suggest

14   that Sheriff Pazin was in any manner part of a conspiracy to

15   "get" Mr. Byrd to take his property. [McKechnie Depo. 82:21-

16   83:1].

17   Plaintiff disputes PUDF 12 on the same grounds as PUDF 11.

18   Plaintiff's assertions do not create an issue of fact that Mr.

19   McKechnie, Plaintiff's defense counsel, was aware of no facts of

20   information that Defendant Pazin was part of the alleged

21   conspiracy.

22   This fact is undisputed.

23   ────────────────

24   [4]Defendant Pazin's motion for summary judgment was filed
     before Defendants' motion to dismiss was resolved.   The Memorandum
25   Decision and Order resolving the motions to dismiss dismissed all
     claims relating to Plaintiff's arrest, conviction and sentence on
26   the basis of *Heck v. Humphrey*, except his claims of excessive bail
     and the nine week delay between his guilty plea and sentencing.

**PUDF 13**:  Sheriff Pazin did not know at the time of his initial arrest and detention in the Merced County Jail that Mr. Byrd did not post bail and therefore remained in the custody of the Sheriff's Department. [Pazin Decl., ¶ 5].

Plaintiff disputes this fact, referring to the "media statement" as reportedly made by Defendant Pazin the day after Plaintiff's arrest.

That Defendant Pazin knew the day following the arrest the amount of bail does not prove that he knew it at the time Plaintiff was arrested and booked and certainly does not imply that Defendant Pazin had any involvement in the setting of the initial bail or involvement in the continuation of the initial bail in proceedings before the Superior Court.]

**PUDF 14**:  Sheriff Pazin had no contact or communication with Mr. Byrd while Byrd was in the custody of the Sheriff's Department. [Pazin Decl., ¶ 5]

Plaintiff disputes this fact "since obviously Pazin and his co-conspirators/co-purchasers had significant contact with Byrd and his attorney in fact, daughter Linda Roybal during this time period in reference to the land transaction."

Plaintiff offers no evidence that Defendant Pazin had any contact with Plaintiff.  Even if Defendant Pazin had contact with Linda Roybal, this does not negate that Pazin had no contact or communication with Plaintiff himself.  Linda Roybal's declaration in opposition to this motion nowhere avers that she had any contact or communication with Defendant Pazin.

19

1    This fact is undisputed.

2    <u>PUDF 15</u>: Defendant Pazin did not have any contact with any

3    members of the Merced County Jail staff regarding the detention

4    of Mr. Byrd, including but not limited to his housing, conditions

5    of confinement, his health or any medical condition, or when he

6    would be released. [Pazin Decl., ¶ 5].

7    Plaintiff disputes this fact, referring to Pazin's "media

8    statement" as reported in the Merced newspaper the day after

9    Plaintiff's arrest.

10   A newspaper account of a statement made by Pazin the day

11   after Plaintiff's arrest does not dispute this fact, especially

12   concerning conditions of confinement, health, medical condition,

13   or release date.

14   This fact is undisputed.

15   <u>PUDF 16</u>:  As of the time Mr. Byrd was arraigned on May 6,

16   2004, he confirmed to the court that he had his full abilities

17   and capabilities and was able to enter a plea and understand the

18   court proceedings. [McKechnie Depo. 67:18-68:21].

19   Plaintiff asserts that "[n]otwithstanding Byrd's in-court

20   pronouncements, Linda Roybal confirms in her declaration that

21   Byrd was still drinking and indeed had to be hospitalized while

22   in jail in relation to his continued drinking."

23   Plaintiff's assertion does not dispute Plaintiff's statement

24   to the Court during his May 6, 2006 arraignment.

25   This fact is undisputed.

26   <u>PUDF 17</u>:  In approximately the latter part of April 2004,

20

Sheriff Pazin attended a private dinner party with some friends. [Pazin Decl., ¶ 6].

Plaintiff asserts: "The earliest property documents in plaintiff's possession are form may 2004 [sic], so it is unclear if the subject property was even for sale when the defendants began conspiring to purchase it."

This assertion does not in any way dispute PUDF 17.

This fact is undisputed.

PUDF 18:  Sheriff Pazin was approached by members of an informal investment group and asked whether he wanted to join others in a group called Bellevue Road Partners, LLC, in investing in certain real estate in Merced County. [Pazin Decl., ¶ 6].

Plaintiff makes the same assertion as made in connection with PUDF 17.  Plaintiff's assertion does not in any way dispute PUDF 18.

This fact is undisputed.

PUDF 19: Defendant Pazin learned that a real estate agent had been retained by this group and that the group's pooled funds would be used to purchase the real estate in question. [Pazin Decl., ¶ 6].

Plaintiff makes the same assertion as made in connection with PUDF 17.  Plaintiff's assertion does not in any way dispute PUDF 19.

This fact is undisputed.

PUDF 20: Defendant Pazin accepted the invitation to

participate in the partnership and invested $78,000 of his own money toward the purchase. [Pazin Decl., ¶ 6].

Plaintiff makes the same assertion as made in connection with PUDF 17.  Plaintiff's assertion does not in any way dispute PUDF 20.

This fact is undisputed.

PUDF 21: Defendant Pazin signed the necessary documents to participate in the anticipated real estate purchase in May 2004, obtaining a 1/16 share of ownership in the property. [Pazin Decl., ¶ 6].

Plaintiff makes the same assertion as made in connection with PUDF 17.  Plaintiff's assertion does not in any way dispute PUDF 21.

Plaintiff also asserts that "defendant Pazin appears to be minimizing his role in the transaction, since there were offers and counteroffers going back and forth between Roybal and the purchasers that undoubtedly necessitated additional action and input by him."

Linda Roybal avers in her declaration: "[T]here were offers and counteroffers made between myself and the purchasers prior to the consummation of the deal in May through July 2004 (after Pazin admittedly became aware of and involved in the land deal), and Pazin's authorization ostensibly would have been required in connection with these negotiations."

None of this raises an issue of material fact regarding PUDF 21.

1    This fact is undisputed.

2    **PUDF 22**: Defendant Pazin knew that the property was located

3    somewhere on Bellevue Road in Merced, California, but at the time

4    was not aware that the owner-seller of that property was Mr.

5    Byrd. [Pazin Decl., ¶ 6].

6        Plaintiff disputes this fact because of "Pazin's

7    involvement, according to his own statements to the media,

8    indicating that he was well aware with [sic] the investigation

9    leading up to Byrd's arrest and the search of the subject

10   property in connection therewith."  Plaintiff also repeats the

11   litany of allegations set forth in opposition to PUDF 11.

12       The only allegations in Plaintiff's opposition to PUDF 11

13   relevant to Pazin's knowledge in late April/early May, 2004 that

14   Plaintiff owned the real property are: "... (11) Byrd's name

15   appeared prominently on property transaction related documents

16   prior to the closing, in some instances on the signature line

17   directly opposite Pazin's, and listing the same property address

18   as the search warrant property ... (19) Byrd's ownership of the

19   subject property was clearly known to members of the alleged

20   conspiracy during his pretrial incarceration, especially

21   defendants Steven Mauzy and Century 21 Salvadori Realty, Pazin's

22   co-conspirators who served as Byrd's agents but who also were

23   purchasers of the property ... (24) defendant Pazin admitted to

24   the media that he was aware of Byrd's being the owner of the

25   subject property prior to the consummation of the purchase,

26   stating that he learned of Byrd's identity in the final stages of

23

the deal and acknowledging after the deal was publicly exposed
that this could give rise to a "perception issue."   None of the
documentary evidence submitted by Plaintiff concerning the real
estate transaction contains Plaintiff's name until May 16, 2004,
but that document is not signed by Pazin.   The final closing
statement dated July 1, 2004 sets forth Plaintiff's name as does
the grant deed and additional escrow instructions dated July 8,
2004.   The fact that the real property had also been the subject
of a search warrant does not, without more, establish Pazin's
knowledge that Plaintiff was the owner of the real property in
late April/early May, 2004, as Plaintiff has no evidence Pazin
had any role in or knowledge of the search warrant.   That Pazin
admitted when the deal closed that he then knew that Plaintiff
was the owner again does not equate to knowledge at an earlier
date.   Finally, Plaintiff presents no evidence that Defendant
Mauzy told Defendant Pazin who owned the property and when
Defendant Mauzy did so.

This fact is undisputed.

**PUDF 23**:   Sheriff Pazin's investment group received a
comprehensive appraisal of the property. [Pazin Decl., ¶ 7].

Plaintiff asserts: "This fact is not substantiated and is
thus irrelevant, especially since contemporaneous listings for
roughly equivalent properties in the same general location were
much, much higher than the $1.3 million purchase price."

Pazin can aver based on his personal knowledge that an
appraisal was received.   There is no evidence to support

24

Plaintiff's assertion that similar properties had higher appraisals (and certainly no explanation why Plaintiff or his daughter did not get another appraisal if they thought the agreed upon purchase price was too low).  Nor does Plaintiff suggest that Plaintiff's daughter was not competent to understand the sale and ascertain the market value of the real property.

This fact is undisputed.

PUDF 24:  Based on the appraisal information provided to the partnership, the group believed in good faith that the estimate reflected an accurate fair market value asking price for the property. [Pazin Decl., ¶ 7].

Plaintiff asserts: "This fact is not substantiated and is thus irrelevant, especially since contemporaneous listings for roughly equivalent properties in the same general location were much, much higher than the $1.3 million purchase price."

Pazin can aver based on his personal knowledge that an appraisal was received and that the partnership relied on it. There is no admissible evidence to support Plaintiff's assertion that similar properties had higher appraisals (and no explanation why Plaintiff or his daughter did not get another appraisal if they thought the agreed upon purchase price was too low).  Nor does Plaintiff suggest that Plaintiff's daughter was not competent to understand the sale and ascertain the market value of the real property.

This fact is undisputed.

PUDF 25:  Bellevue Road Partners made the decision to

25

1   purchase this property for $1.3 million. [Pazin Decl., ¶ 7].

2       Plaintiff asserts that Pazin was a member of the partnership

3   and further asserts that "Pazin appears to be minimizing his role

4   in the transaction, since there were offers and counteroffers

5   going back and forth between Roybal and the purchasers that

6   undoubtedly necessitated additional action and input by him."

7       Linda Roybal avers in her declaration: "[T]here were offers

8   and counteroffers made between myself and the purchasers prior to

9   the consummation of the deal in May through July 2004 (after

10  Pazin admittedly became aware of and involved in the land deal),

11  and Pazin's authorization ostensibly would have been required in

12  connection with these negotiations."

13      Plaintiff's assertions do not dispute PUDF 25.

14      This fact is undisputed.

15      <u>PUDF 26</u>:  Pazin's good faith belief that the group paid fair

16  market value for the real estate in question was reinforced by

17  individuals in the community who told him that the investment

18  group had, in fact, paid too much for property. [Pazin Decl., ¶

19  7].

20      Plaintiff asserts: "This fact is not substantiated and is

21  thus irrelevant, especially since contemporaneous listings for

22  roughly equivalent properties in the same general location were

23  much, much higher than the $1.3 million purchase price."

24      Pazin can aver based on his personal knowledge that he was

25  told that the partnership paid too much for the property.  There

26  is no evidence to support Plaintiff's assertion that similar

26

properties had higher appraisals (and no explanation why
Plaintiff or his daughter did not get another appraisal if they
thought the agreed upon purchase price was too low).  Nor does
Plaintiff suggest that Plaintiff's daughter was not competent to
understand the sale and ascertain the market value of the real
property.

This fact is undisputed.

**PUDF 27**:  Sheriff Pazin first learned that the property the
partnership was purchasing was owned by Mr. Byrd in June 2004.
[Pazin Decl., ¶ 8].

Plaintiff disputes this fact by reciting the litany of
allegations set forth in opposition to PUDF 11.  These
allegations in no way dispute or constitute evidence from which
it may be inferred that Defendant Pazin knew before June 2004
that Plaintiff owned the property being purchased by the
partnership.

This fact is undisputed.

**PUDF 28**:  Mr. Byrd's ownership of the property came to light
for Sheriff Pazin when Mr. Stephen Mauzy, the real estate agent
retained by the partnership, came to Sheriff Pazin's office at
the Sheriff's Department and requested that he be permitted
to visit Mr. Byrd in the jail for the purpose of having him sign
the purchase documents. [Pazin Decl., ¶ 8].

Plaintiff asserts that PUDF 28 is "irrelevant, since a
litany of circumstantial facts show that Pazin nonetheless
participated in the alleged conspiracy" and then refers to the

27

allegations set forth in opposition to PUDF 11.

This fact is undisputed; Plaintiff has no evidence that Defendant Pazin participated in any way in the alleged conspiracy.

**PUDF 29**:  Sheriff Pazin told Mr. Mauzy that he could not and would not assist him with visiting Mr. Byrd for that purpose and that Mr. Mauzy would have to go through the normal process to see Mr. Byrd just the same as any other person would for purposes of visiting or conducting business. [Pazin Decl., ¶ 8].

Plaintiff asserts that PUDF 29 is "irrelevant, since a litany of circumstantial facts show that Pazin nonetheless participated in the alleged conspiracy" and then refers to the allegations set forth in opposition to PUDF 11.

This fact is undisputed; Plaintiff has no evidence that Defendant Pazin participated in any way in the alleged conspiracy.

**PUDF 30**:  Mr. Mauzy did as Sheriff Pazin suggested and the necessary documents were signed. [Pazin Decl., ¶ 8].

Plaintiff asserts that PUDF 30 is "irrelevant, since a litany of circumstantial facts show that Pazin nonetheless participated in the alleged conspiracy" and then refers to the allegations set forth in opposition to PUDF 11.

This fact is undisputed; Plaintiff has no evidence that Defendant Pazin participated in any way in the alleged conspiracy.

**PUDF 31**:  Some days later, Sheriff Pazin went to the escrow

28

1  company to sign the purchasing documents for the real
2  estate. [Pazin Decl., ¶ 9].

3      Plaintiff asserts that PUDF 31 is "irrelevant, since a
4  litany of circumstantial facts show that Pazin nonetheless
5  participated in the alleged conspiracy" and then refers to the
6  allegations set forth in opposition to PUDF 11.

7      This fact is undisputed; Plaintiff has no evidence that
8  Defendant Pazin participated in any way in the alleged
9  conspiracy.

10     **PUDF 32**:  The escrow documents, which were signed by Mr.
11  Byrd, reflected the names of all of the individual purchasers of
12  the property, including Sheriff Pazin. [Pazin Decl., ¶ 9 and Exh.
13  A thereto].

14     Plaintiff asserts that PUDF 32 is "irrelevant, since a
15  litany of circumstantial facts show that Pazin nonetheless
16  participated in the alleged conspiracy" and then refers to the
17  allegations set forth in opposition to PUDF 11.

18     This fact is undisputed; Plaintiff has no evidence that
19  Defendant Pazin participated in any way in the alleged
20  conspiracy.

21     **PUDF 33**:  There was never any intent on the part of Sheriff
22  Pazin,, nor did he have any knowledge, that Mr. Byrd's
23  constitutional rights could be violated in any way by his
24  participation in this private business transaction. [Pazin Decl.,
25  ¶ 10].

26     Plaintiff asserts that PUDF 33 is "irrelevant, since a

litany of circumstantial facts show that Pazin nonetheless
participated in the alleged conspiracy" and then refers to the
allegations set forth in opposition to PUDF 11.

This fact is undisputed; Plaintiff has no evidence that
Defendant Pazin participated in any way in the alleged
conspiracy.

**PUDF 34**:  Sheriff Pazin subsequently sold his share of the
property to Hostetler Investments, LLC, on August 18,
2006. [Pazin Decl., ¶ 11 and Exh. B thereto].

Plaintiff asserts that PUDF 34 is irrelevant, "since Pazin
only sold the property after his nefarious involvement was
exposed and this action was filed" and that "if anything, his
sale, and related statements to the media, show a consciousness
of wrongdoing."

This fact is undisputed; Plaintiff has no evidence that
Defendant Pazin participated in any way in the alleged
conspiracy.

**PUDF 35**: Sheriff Pazin has had no further interest in the
property since that time. [Pazin Decl., ¶ 11].

Plaintiff asserts that PUDF 35 is irrelevant, "since Pazin
only sold the property after his nefarious involvement was
exposed and this action was filed" and that "if anything, his
sale, and related statements to the media, show a consciousness
of wrongdoing."

This fact is undisputed; Plaintiff has no evidence that
Defendant Pazin participated in any way in the alleged

conspiracy.

**PUDF 36**: Plaintiff has never filed a government tort claim regarding any of the conduct he attributes to Pazin. [Declaration of Lydia A. Beiswanger in Support of Defendant's Motion for Summary Judgment/Adjudication].

Plaintiff asserts that this fact is irrelevant "based on the Court's ruling on the defendants' motions to dismiss on February 21, 2008, Docket 79."

C.   **MERITS OF MOTION**.

The undisputed facts establish that Defendant Pazin is entitled to summary judgment on all claims alleged against him as a matter of law.

With regard to Plaintiff's claims for violations of constitutional rights pursuant to 28 U.S.C. § 1983, Plaintiff limits his opposition to Pazin's motion for summary judgment to the law of conspiracy.  Plaintiff's First Amended Complaint will apparently allege that Defendant Pazin conspired with the other Defendants, presumably Defendant Spencer and those other individuals and entities that purchased Plaintiff's real property, to violate Plaintiff's constitutional right(s) by imposing an excessive bail and by delaying Plaintiff's sentencing until after the escrow closed on the real property transaction in order to purchase Plaintiff's property for less than its fair market value.[5]

---

[5]Plaintiff's memorandum of points and authorities primarily relies on Seventh Circuit law, none of which has been cited at all

1      To prove a conspiracy, Plaintiff must show "an agreement or

2 'meeting of the minds' to violate constitutional rights." *United*

3 *Steelworkers of Am. v. Phelps*, 865 F.2d 1539, 1540-1541 (9th

4 Cir.), *cert. denied*, 493 U.S. 809 (1989).  "To be liable, each

5 participant in the conspiracy need not know the exact details of

6 the plan, but each participant must at least share the common

7 objective of the conspiracy."  *Id.* at 1541.  "The defendants must

8 have, 'by some concerted action, intend[ed] to accomplish some

9 unlawful objective for the purpose of harming another which

10 results in damage."  *Mendocino Environmental Center v. Mendocino*

11 *County*, 192 F.3d 1283, 1301 (9th Cir.1999):

12             Such an agreement need not be overt, and may
             be inferred on the basis of circumstantial

13             evidence such as the actions of the
             defendants ... For example, a showing that

14             the alleged conspirators have committed acts
             that 'are unlikely to have been undertaken

15             without an agreement' may allow a jury to
             infer the existence of a conspiracy ...

16             Whether defendants were involved in an
             unlawful conspiracy is generally a factual

17             issue and should be resolved by the jury, 'so
             long as there is a possibility that the jury

18             "can infer from the circumstances (that the
             alleged conspirators) had a 'meeting of the

19             minds" and thus reached an understanding" to
             achieve the conspiracy's objectives.'

20

21 *Id.* at 1301-1302.  "The plaintiffs were required to produce

22 'concrete evidence' of an agreement or 'meeting of the minds'

23 between Daniels and others to violate the plaintiff's rights [in

24 _____

25 by the Ninth Circuit.  Plaintiff also cites cases discussing the
adequacy of pleading a conspiracy for purposes of Rule 12(b)(6),

26 Federal Rules of Civil Procedure.  These cases have no relevance to
resolution of a motion for summary judgment.

order to forestall summary judgment.] *See Phelps Dodge*, 865 F.2d at 1540-41, 1543.  This the plaintiffs have not done."  *Radcliff v. Rainbow Const. Co.*, 254 F.3d 772, 782 (9th Cir.), *cert. denied*, 534 U.S. 1020 (2001).

Plaintiff argues that "[m]embers of conspiracies rarely admit their involvement in wrongdoing, so it simply cannot be the case that defendant Pazin's self-serving denials are the persuasive evidence he portrays them to be in his motion for summary judgment [and that] "the Court should be highly concerned that Pazin has subscribed to a declaration that seemingly contains intentional falsehoods":

> [S]pecifically his statements indicating that he was not contemporaneously aware of Byrd's arrest (¶ 3), lacked knowledge of Byrd's bail status and criminal case (¶ 4), and did not know that Byrd did not post bail and remained in custody (¶ 5).

Plaintiff refers to the article in the Merced Sun-Times on March 11, 2004, the day after Plaintiff's arrest as demonstrating that Pazin's averments are deliberate falsehoods.

Pazin avers in his declaration as follows:

> 3.  It is my understanding that on or about March 11, 2004, Richard Byrd was arrested and booked into the Merced County Jail on felony charges of attempted bribery of a peace officer.  I became aware of the arrest and charges against Mr. Byrd sometime during March 2004, since the matter involved one of our Deputy's [sic] and he (Byrd) was a former law enforcement officer.
>
> 4.  Following the arrest of Mr. Byrd, I had very limited knowledge or information regarding his criminal court process, including but not limited to his arraignment,

bail or other criminal case-related matters.
Specifically, I was not and am not aware of
the exact amount at which Mr. Byrd's bail was
set; all bail amounts are set by the
Presiding Judge.   I had absolutely no role
whatsoever in setting the amount of bail or
in otherwise recommending that bail be set at
a specific amount.   This is a function of the
District Attorney and the judge assigned to
the case; it does and did not involve myself,
the Sheriff.   I did not communicate with
Defendant Gordan Spencer or any other deputy
district attorneys and/or C. Logan McKechnie,
Mr. Byrd's criminal defense counsel, in
Merced County regarding any aspect of the
criminal case against Mr. Byrd or any issues
related thereto.

5.   I did not know at the time of his initial
arrest and detention in the Merced County
Jail that Mr. Byrd did not post bail and
therefore remained in the custody of the
Sheriff's Department.   I had no contact or
communication with Mr. Byrd while he was in
the custody of the Sheriff's Department.   In
addition, I did not have any contact with
members of the Merced County jail staff
regarding the detention of Mr. Byrd,
including but not limited to his housing,
conditions of confinement, his health or any
medical condition, or when he would be
released.

Plaintiff contends:

What does the Court do with a motion for
summary judgment when the primary source of
evidence upon which it is based is not only
self-serving but, at least in the above
respects, seemingly intentionally false?
After all, there is no 'right' to summary
judgment ... and a defendant shown to rely on
unreliable evidence certainly should not
receive the benefit of the discretionary
relief available under Rule 56.

As discussed above in the statement of facts, Plaintiff's

assertion that Defendant Pazin's declaration is intentionally

false is not confirmed by evidence.   All inferences are drawn in

34

favor of the non-moving party, Plaintiff.  Although the Merced Sun-Times article on the day following Plaintiff's arrest reports that Pazin described the investigation leading to Plaintiff's arrest and stated that Byrd's bail on his arrest was $500,000, Pazin's declaration does not state that he was not "contemporaneously aware" of Byrd's arrest; the article does not state or imply that Pazin had anything to do with setting Plaintiff's bail on his arrest or at any time thereafter and does not imply that Pazin had any knowledge of Plaintiff's bail and custody status at any time after the day following Plaintiff's arrest.  Plaintiff lacks facts because Plaintiff did not take Pazin's deposition after obtaining a continuance of the motion for summary judgment to do so.  There is no evidence that Pazin conspired to do anything to violate Plaintiff's constitutional rights.  Plaintiff refers to the litany of allegations set forth in his opposition to PUDF 11.  As Defendant Pazin contends, the most that Plaintiff can demonstrate is that Pazin was the sheriff when Plaintiff was arrested on March 11, 2004.  None of the affidavits or evidence submitted by Plaintiff contain any facts from which it may be inferred that Pazin personally participated in the setting of Plaintiff's bail, the timing of bail, the length of Plaintiff's pre-sentence detention, or the circumstances of Plaintiff's pre-sentence detention.  Plaintiff submits no evidence from which it may be inferred that Defendant Pazin knew of the allegedly unconstitutional actions of the other defendants.

1   Because Plaintiff cannot withstand summary judgment for

2   Defendant Pazin on the ground that Pazin conspired with the other

3   defendants to violate Plaintiff's constitutional right(s) by

4   imposing an excessive bail and by delaying Plaintiff's sentencing

5   until after the escrow closed on the real property transaction in

6   order to purchase Plaintiff's property for less than its fair

7   market value, Defendant Pazin's motion for summary judgment on

8   the federal constitutional claims is GRANTED.[6]

9       D.   STATE LAW CAUSES OF ACTION.

10      The Complaint alleged the following state law causes of

11  action against Defendant Pazin: "for abuse of process,

12  manipulation of the criminal proceedings, intentional

13  interference with economic advantage, and conspiracy" and for

14  "fraud (both actual and constructive), breach of the covenant of

15  good faith and fair dealing, intentional interference with

16  prospective economic advantage, ... negligent misrepresentation,

17  and rescission."  Presumably, the First Amended Complaint will

18  set forth similar claims for relief.

19          1.   California Government Claim Act.

20      It is undisputed that Plaintiff did not file a claim

21  pursuant to the claim requirements of the California Government

22  Claim Act.  Defendant Pazin moves for summary judgment based on

23  _____

24      [6]This conclusion establishes that Defendant Pazin did not take
    any action or inaction in his capacity as a law enforcement officer
25  under color of state law that violated Plaintiff's constitutional
    rights.   This conclusion makes unnecessary any discussion of
26  qualified immunity from liability under Section 1983. *See Saucier
    v. Katz*, 533 U.S. 194, 201 (2001).

1   this lapse.

2       The Memorandum Decision and Order filed on February 21,

3   2008, resolving the motions to dismiss (Doc. 79), ruled:

4           Plaintiff argues that this lapse 'only
            results in the dismissal of state civil
5           rights damage claims against the subject
            defendants as government officials, not other
6           state claims against them as private
            purchasers of property.'  Plaintiff cites
7           California Government Code § 905.

8           To the extent that the Complaint alleges
            claims against Defendant Spencer for fraud,
9           breach of the covenant of good faith and fair
            dealing, intentional interference with
10          prospective economic advantage, negligent
            misrepresentation, and rescission arising out
11          of Defendant Spencer's acquisition of
            Plaintiff's real property, the claim
12          requirement of the Tort Claims Act does not
            apply.

13          ...

14
            Defendant Spencer's motion to dismiss for
15          Plaintiff's failure to comply with the
            California Tort Claim Act IS GRANTED IN PART
16          WITH PREJUDICE as to claims for damages and
            equitable relief against Spencer for actions
17          taken in his capacity of Merced County
            District Attorney.  Spencer's motion to
18          dismiss for failure to comply with the
            California Tort Claim Act IS DENIED as to
19          claims for damages and equitable relief
            arising out of Spencer's acquisition of
20          Plaintiff's real property.

21      The same conclusion applies with regard to Defendant Pazin

22   in his official capacity.

23               2.   Merits of State Law Claims.

24      Defendant Pazin argues that he is entitled to summary

25   judgment on the merits of the state law claims alleged against

26   him in the Complaint:

                                37

> [T]he undisputed facts establish that Pazin
> had no knowledge of or part the [sic]
> criminal investigation or prosecution of
> Plaintiff, his detention in the Merced County
> Jail or the duration or conditions thereof,
> or the amount of his bail.  Pazin also was
> unaware that real property that was the
> subject of the investment group's purchase
> belonged to Byrd until the transaction was
> essentially complete.

Plaintiff does not specifically respond to this ground for summary judgment.  Plaintiff's opposition to the merits of the motion relies on the allegations set forth in PUDF 11.  For the reasons stated above, these allegations do not create an issue of material fact that Defendant Pazin had any participation in any alleged conspiracy to deprive Plaintiff of his real property at less than fair market value by imposing an excessive bail and delaying the imposition of sentence in the underlying criminal case.

Plaintiff's motion for summary judgment on the state law causes of action is GRANTED.[7]

CONCLUSION

For the reasons stated:

1.   Defendant Pazin's motion for summary judgment is GRANTED;

2.   Counsel for Defendant Pazin shall prepare and lodge a form of order setting forth the rulings in this Memorandum Decision within five (5) days following the date of service of

---

[7]This conclusion makes unnecessary resolution of Defendant Pazin's motion for summary judgment on Plaintiff's claim for declaratory relief.

this decision.

IT IS SO ORDERED.

Dated: __May 6, 2008__                    _____/s/ Oliver W. Wanger_____
                                          UNITED STATES DISTRICT JUDGE